885 F.2d 871
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
TRUSTEES FOR MICHIGAN CARPENTERS' COUNCIL HEALTH AND WELFARE
FUND, Michigan Carpenters' Council Pension Fund, Michigan
Carpenters' Council Apprenticeship & Training Fund, and
Michigan Chapter Associated General Contractors of America,
Plaintiffs-Appellants Cross-Appellees,
v.
SOBIE COMPANY, INC., a Michigan corporation,
Defendant-Appellee Cross-Appellant.
 Nos. 88-1439, 88-1738 and 88-1799.
 United States Court of Appeals, Sixth Circuit.
 Sept. 25, 1989.
 
 Before RALPH B. GUY, Jr., BOGGS and ALAN E. NORRIS, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 In this action to recover delinquent fringe-benefit contributions, brought pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001, et seq., plaintiffs, the trustees of three multiemployer fringe-benefit funds (the Funds)[1] and the Michigan Chapter of the Associated General Contractors of America, appeal the district court's judgment for the defendant employer, Sobie Company, Inc. (Sobie), and the award of attorney's fees in favor of Sobie. Sobie cross-appeals the district court's pretrial decision that the applicable statute of limitations in this case is Michigan's six-year statute for general contract actions as opposed to its one-year statute governing claims for wages and fringe benefits. We are persuaded that the district court's ruling as to liability and attorney's fees was correct. Accordingly, we affirm that ruling without reaching the statute of limitations issue.
 
 
 2
 Sobie is a specialty building contractor based in Grand Rapids, Michigan. Sobie had a bargaining relationship with the Union[2] for some thirty to thirty-five years, during which they executed various collective bargaining agreements (CBAs).[3] The Funds are multiemployer benefit funds that receive contributions pursuant to CBAs negotiated between Sobie and the Union. By their terms, the CBAs in this case covered "journeymen carpenters and apprentices." (App. 34). An apprentice, as understood by the parties, is a carpenter who is enrolled in an organized apprenticeship program, as referenced in the CBA. (App. 42). A journeyman is a carpenter who has completed the apprenticeship program or its equivalent and who has been designated by the Union as a fully-skilled carpenter. The provisions of the various CBAs are identical with respect to Sobie's obligation to make fringe-benefit contributions, but vary from year to year on the amount of contribution rates.[4] The CBA's Union security clause requires employees covered by the agreement to become members of the Union. The bargaining relationship between the Union and Sobie ended in 1986, when a majority of Sobie employees voted to decertify the Union as their collective bargaining representative. This suit commenced shortly thereafter.
 
 
 3
 The CBA grants Sobie "full and exclusive power and discretion in hiring new employees for their respective jobs." (App. 35). Historically, Sobie employed workers classified as journeymen carpenters to carry out construction work. Sobie also employed workers who performed carpentry work from time to time, but whose skill levels precluded them from being classified as carpenters by the company. Sobie's journeymen carpenters were members of the Union, as required. Pursuant to the CBA, Sobie paid fringe-benefit contributions to the Funds for its journeymen carpenters and apprentices. Sobie did not, however, make any contributions on behalf of those employees not classified as journeymen or apprentice carpenters. Likewise, those employees were not required to join the Union. Both Union and management testimony indicated that an employee did not become covered by the CBA merely because he periodically performed carpentry work. Moreover, the Union never objected to Sobie's employment practices.
 
 
 4
 The Funds, in 1981, conducted a payroll audit of Sobie and queried "non-carpenter/non-Union" employees about the nature of their work. Some workers indicated that they were performing carpentry work. Thus, by at least 1981, the Funds became aware that Sobie was not making fringe-benefit contributions for some employees who performed carpentry work. Nevertheless, the Funds did not issue any notice of delinquent contributions or take other action against Sobie.
 
 
 5
 In 1984, the Funds again audited Sobie and, again, contacted and queried non-carpenter/non-Union employees about the nature of their work. When Sobie's president, Jake Austhof, learned of these contacts and realized that the Funds might be trying to collect delinquent contributions for those employees, he refused to sign a new CBA[5] with the Union until the fringe-benefit contribution issue was resolved. Subsequently, the Union secretary-treasurer, Art Selles, approached Austhof seeking his signature on a new CBA. Selles promised to take care of the fringe-benefit issue regarding non-Union employees. According to Austhof, Selles, in Austhof's presence, picked up the phone and spoke to someone at the Funds about the matter and proclaimed, "It's settled, business as usual." Austhof, believing that the issue had been resolved, signed the new CBA. Again, the Funds did not issue a notice of delinquency or otherwise make a claim against Sobie.
 
 
 6
 In June 1985, State Carpenters representative Harold McCastle was assigned to Sobie by Marv Grisham, the secretary-treasurer of State Carpenters, who also served as the head trustee of the Funds. McCastle began probing into the Funds' perceived difficulties with Sobie. Representatives of the Funds and State Carpenters coordinated efforts to resolve two concerns: (1) completing a 1984 audit and resolving the fringe-benefit problem, and (2) Sobie's employment of both Union and non-Union workers performing carpentry work. McCastle asked Grisham to defer any action by the Funds in order to see if Union representatives could resolve the matter.
 
 
 7
 Previously, in April 1985, State Carpenters representative Freeman Billock persuaded Sobie to classify six more employees as journeymen carpenters or apprentices. Those employees then joined the Union. Effective May 1, 1985, Sobie began paying fringe-benefit contributions on those six employees. Neither the Union nor the Funds claimed that Sobie was obligated to pay retroactive benefits for those employees for the period prior to their reclassification.
 
 
 8
 On May 31, 1985, James Hutchison, the president of the District Council, pursuant to the CBA, notified Sobie by mailgram (App. 252) that it was in violation of the Union security and fringe-benefit provisions of the CBA. On the same day, the Funds demanded an audit of payroll records. Subsequently, State Carpenters representative Harold McCastle, District Council President James Hutchison, and Carpenters Local business agent Orville Hubert met with Sobie officials to discuss the issues noticed in the mailgram. Key Fund representatives were aware that these issues were going to be negotiated. The negotiations culminated in a June 14, 1985, "Settlement Agreement" (App. 259) in which Sobie agreed that any employees performing carpentry work would be reclassified as apprentices and become Union members as of June 1, 1985. Appended to the Settlement Agreement was a list of employees identified for reclassification and enrollment in the Union. Sobie and the Union ultimately agreed that Sobie would commence making fringe-benefit contributions as of January 1, 1986, for all newly-enrolled employees.[6] (App 268). Austhof understood that the Union representatives with whom he was dealing had authority to negotiate with the company with respect to fringe benefits.[7] At no time did any of the Union representatives advise him that the Union or the Funds reserved a claim for retroactive fringe-benefit contributions on employees who were reclassified in May or June of 1985. McCastle and Hubert testified that the purpose of the Settlement Agreement was to get Sobie to start paying contributions on the employees who, theretofore, had been non-Union employees. Pursuant to the Settlement Agreement, the identified employees enrolled in the Union and Sobie began paying contributions to the Funds for them.
 
 
 9
 Following the 1986 decertification of the Union, the Funds conducted another audit of Sobie's payroll records and, subsequently, claimed that Sobie was obligated to pay contributions on each employee who had been reclassified as a carpenter or apprentice in May or June 1985 for the entire duration from his date of hire to the date he was reclassified. The Funds presumed that if an employee was reclassified in May or June of 1985, he was engaged in carpentry work from his date of hire and Sobie was liable for contributions for that entire period.[8] The Funds have never paid any claims on behalf of any of the employees for whom they seek contributions.
 
 I.
 
 10
 Resolution of this dispute requires us to review and interpret the various contractual agreements establishing Sobie's obligation to make contributions to the Funds.[9] Our standard of review of these contractual agreements is de novo. Carpenters Local Union No. 345 Health & Welfare Fund v. W.D. George Constr. Co., 792 F.2d 64 (6th Cir.1986) (citing Weimer v. Kurz-Kasch, Inc., 773 F.2d 669, 671 (6th Cir.1985)).
 
 
 11
 We first consider whether the district court erred in interpreting the CBA as requiring contributions only for "journeymen carpenters and apprentices" and not for employees who only periodically engaged in carpentry work for the company.
 
 
 12
 The "intent and purpose" provision of the CBA provides, in pertinent part:
 
 
 13
 This agreement establishes by mutual consent of all parties specific rules and regulations to govern employment, wage scales and working conditions of journeymen carpenters and apprentices employed by the contractors....
 
 
 14
 (App. 34).
 
 
 15
 The CBA provision governing Sobie's obligation to make fringe-benefit contributions provides, in pertinent part:
 
 
 16
 Section 1: Apprenticeship Fund. The Employer agrees to pay into the Joint Apprenticeship and Training Fund for each hour worked by all employees covered by this agreement in accordance with the schedule in Article VIII.
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 Section 3: Health and Welfare and Pension Fund. The employer agrees to pay into the Michigan Carpenters Council Health & Welfare Fund and the Michigan Carpenters Council Pension Fund for each hour worked by all employees covered by this agreement, in accordance with the schedule in Article VIII, and in accordance with the Trust Fund Agreement negotiated between the Michigan State Carpenters' Council and the Michigan Chapter Associated General Contractors of America, Inc.
 
 
 20
 (App. 40). The district court construed the CBA in accordance with its literal terms, i.e., as covering only those employees classified as journeymen carpenters or apprentices and as excluding employees not classified as such, but who, nevertheless, periodically engaged in carpentry work. The Funds urge that such a construction is illegal because it discriminates between Union and non-Union employees vis-a-vis fringe benefits.
 
 
 21
 We have recognized that, although the enforcement and interpretation of CBAs are matters of federal substantive law, traditional rules of contract interpretation are applicable to the extent they coincide with federal labor policies. International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983), cert. denied, 465 U.S. 1007 (1984). The first step in interpreting a CBA requires reference to "the explicit language of the collective bargaining agreement for clear manifestations of intent." Id. at 1479 (citation omitted). In Yard-Man, we also noted that:
 
 
 22
 The intended meaning of even the most explicit language can ... only be understood in light of the context which gave rise to its inclusion ... [and requires interpretation of] each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.
 
 
 23
 Id. at 1479-80 (citations omitted).
 
 
 24
 Applying these basic contract construction principles to the present case persuades us that the district court properly determined that the CBA did not extend to the non-Union/non-carpenter employees until Sobie reclassified them as journeymen carpenters and apprentices pursuant to the May 1985 agreement and the June 1985 Settlement Agreement. Whether a particular employee is covered by the CBA in this case depends on whether that employee was designated by Sobie as a journeyman carpenter or an apprentice and not on the nature of work he performed. This case is distinct from those in which a CBA's coverage extends to any employees "performing work" covered by the agreement. See, e.g., Pierce County Hotel Employees & Restaurant Employees Health Trust v. Elks Lodge B.P.O.E., No. 1450, 827 F.2d 1324, 1326 (9th Cir.1987). Here, coverage was expressly limited by job classification, and the CBA expressly confers upon Sobie full and exclusive discretion to hire and classify employees for their respective positions.
 
 
 25
 We reject, as without merit, the Funds' claim that the district court's construction of the CBA impermissibly discriminates between Union and non-Union workers. Although it is true that the Union security clause in the CBA requires employees to join the Union within eight days, the fact remains that once an employee is classified as a journeyman carpenter or apprentice, he is covered by the CBA, whether or not he is a Union member. We are convinced that the district court correctly determined that the CBA did not obligate Sobie to make fringe-benefit contributions on behalf of the reclassified employees until such time that the employees were redesignated as journeymen carpenters or apprentices.
 
 
 26
 Although no extrinsic evidence is necessary to support the district court's interpretation of the explicit language of the CBA, such evidence was, nevertheless, available. The record is replete with testimony reflecting both the Union's and Sobie's understanding of the term apprentice, an understanding that is inconsistent with the Funds' attempted characterization of the employees in question as covered by the CBA.[10] Both Union and Sobie testimony reflected the parties' understanding that Sobie maintained the full and exclusive right to hire and classify new employees. When Union officials felt that certain employees should be reclassified, Sobie was receptive and compliant. Until a given employee was reclassified, however, the Union and Sobie understood that he simply was not covered by the CBA. Therefore, Sobie had no obligation to make fringe-benefit contributions on his behalf and, accordingly, is now not obliged to make retroactive contributions on behalf of any reclassified employee.
 
 
 27
 The Funds also challenge the district court's order awarding attorney's fees to Sobie, pursuant to 29 U.S.C. Sec. 1132(g)(1). This issue is not properly before us because the Funds failed to oppose Sobie's motion for costs and attorney's fees, or to otherwise properly raise the issue before the district court.[11] Boone Coal & Timber Co. v. Polan, 787 F.2d 1056 (6th Cir.1986). Even if the issue was properly before us, we would find that, contrary to the Funds' position, section 1132(g)(1) does authorize the discretionary award of costs and attorney's fees, even when the Fund is seeking delinquent contributions. We would also find that the district court did not abuse its discretion in awarding such costs and fees here. Section 1132(g) of ERISA provides:
 
 
 28
 (1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.
 
 
 29
 (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--
 
 
 30
 (A) the unpaid contributions,
 
 
 31
 (B) interest on the unpaid contributions,
 
 
 32
 (C) an amount equal to the greater of--
 
 
 33
 (i) interest on the unpaid contributions, or
 
 
 34
 (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
 
 
 35
 (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
 
 
 36
 (E) such other legal or equitable relief as the court deems appropriate.
 
 
 37
 For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.
 
 
 38
 Section 1145, referred to in section 1132(g)(2), is entitled "Delinquent contributions" and requires all employers obligated, pursuant to a CBA, to contribute to a multiemployer plan to make such contributions in accordance with the terms and conditions of that CBA.[12] The Funds claim that section 1132(g)(2) is the exclusive provision governing attorney's fees and costs when, as here, a plan's fiduciaries bring an action for delinquent contributions. We would disagree with the Fund's construction of section 1132(g)(1). That section authorizes the discretionary award of costs and attorney's fees to either party. The only exception to this section is found in section 1132(g)(2), which makes the award of costs and attorney's fees mandatory when a plan prevails in an action to recover delinquent contributions. Although this action is one by a plan to recover delinquent contributions, it is not one in which the Funds prevailed. Therefore, section 1132(g)(2) does not compel the mandatory award of costs and fees to the plan, nor does it bar such award to Sobie under section 1132(g)(1). Instead, pursuant to section 1132(g)(1), the award to either party becomes discretionary. See Carpenters S. Cal. Admin. Corp. v. Russell, 726 F.2d 1410, 1415 (9th Cir.1984) (rejecting the construction taken by the Funds and finding nothing in ERISA's legislative history supporting that construction or denying district court discretion to award attorney's fees to employers in section 1145 actions); see also Paddack v. Morris, 783 F.2d 844 (9th Cir.1986).
 
 
 39
 In evaluating the propriety of the discretionary award of attorney's fees and costs under ERISA, we typically have considered the following five factors:
 
 
 40
 (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.
 
 
 41
 Secretary, Dept. of Labor v. King, 775 F.2d 666, 669 (6th Cir.1985).
 
 
 42
 The district court regarded the issue of the Funds' culpability or bad faith as a close call. Nevertheless, the court found an absence of evidence to support the Funds' construction of the CBA, and further found that, at least by 1981, the Funds were aware that the Union's and Sobie's construction of the CBA was contrary to that which the Funds propounded at trial. The district court also was concerned about the Funds' encouragement of Union representatives to bind Sobie to contribute to the Funds in the face of the Funds' subsequent refusal to be bound by the Union's and Sobie's Settlement Agreement. The court concluded that, although the suit was not necessarily begun in bad faith, it was unreasonable to continue it in the face of the Union's position and the credible evidence adduced at trial. The court also determined that the Funds were capable of satisfying a reasonable attorney's fee award and that the award could conceivably deter the Funds from pursuing similar claims against other employers. Additionally, the court noted that the action did not further any significant legal issues or benefits sought to be conferred uniquely under ERISA and that the Funds did not claim liability for claims by any of the disputed employees. Finally, the district court regarded the merits of the parties' position as favoring Sobie. In exercising its discretion to award Sobie attorney's fees, the court expressed its cognizance of ERISA's purpose of providing a framework for administering employee benefits and for enforcing employer obligations. Nevertheless, having concluded that the prosecution of this case was "unreasonable and unfair" and that the Funds' position was meritless, the court awarded Sobie attorney's fees and costs. However differently we might have considered this issue de novo, we would not conclude that the fee award constituted an abuse of discretion.
 
 III.
 
 43
 Because we are in accord with the district court's construction of the parties' obligations under the CBA, we need not consider the validity of the district court's alternate grounds for its decision.[13] Likewise, we decline to resolve the statute of limitations issue raised in Sobie's cross-appeal. In its cross-appeal, Sobie contends that the district court erred in its pretrial decision that the appropriate statute of limitations governing this claim is six years in accordance with the statute of limitations generally applicable to contract actions in Michigan, Mich.Comp.Laws Ann. Sec. 600.5807(8), rather than one year pursuant to section 408.481(1) of Michigan's Wages and Fringe Benefit Act, Mich.Comp.Laws Ann. Sec. 408.471, et seq. The issue arises because ERISA does not contain a statute of limitations applicable to actions to recover delinquent contributions. Consequently, the district court was required to adopt the appropriate analogous state statute of limitations under the principles set forth in International Union, UAW v. Hoosier Cardinal Corp., 383 U.S. 696, 705 (1966) (court employs analogous state statute of limitations in federal action under Labor Management Relations Act).
 
 
 44
 Having found that the district court's judgment with respect to liability and costs should be affirmed, we find it unnecessary to resolve the statute of limitations issue at this time.[14]
 
 
 45
 The district court's judgment is AFFIRMED.
 
 
 
 [1]
 The Funds are the Michigan Carpenters' Council Health and Welfare Fund, the Michigan Carpenters' Council Pension Fund, and the Michigan Carpenters' Council Apprenticeship & Training Fund
 
 
 [2]
 The term Union herein collectively refers to the Michigan State Carpenters' Council (State Carpenters), the Southwestern Michigan Carpenters' District Council (District Council), and Carpenters Local 335 (Carpenters Local), which are all affiliated with the United Brotherhood of Carpenters and Joiners of America
 
 
 [3]
 Sobie and the Union were parties to various CBAs in effect for most of the period from June 1980 through May 1986
 
 
 [4]
 Because the present dispute arises out of Sobie's obligation under the applicable CBAs to pay fringe-benefit contributions, we shall hereinafter refer to the 1982-83 CBA (App. 32) as representative of the applicable provisions creating Sobie's obligation to contribute
 
 
 [5]
 The existing CBA expired on May 31, 1984
 
 
 [6]
 Originally, Sobie planned to begin paying benefits as the identified employees completed work on projects for which the contributions were deemed waived because of the fact that the project, when bid, did not contemplate liability for such contributions. When recordkeeping became cumbersome, the parties agreed to the January 1, 1986, commencement date
 
 
 [7]
 Generally, although employee benefit funds are not parties to the collective bargaining process or agreements, they maintain regular contact and work closely with unions. They confer with union representatives on fringe-benefit issues and vicariously provide the language used in the fringe-benefit provisions of the CBA. Moreover, once the CBA is executed, the funds maintain regular contact with union officials and rely on those officials to monitor compliance with the CBA's fringe-benefit contribution requirements and to report any discrepancies. The funds may periodically audit an employer's payroll records, sometimes at the request of the union. Although funds operate independently, in this case, seveal of the Union's business representatives served as trustees of the Funds
 
 
 [8]
 The Funds considered themselves bound by the Settlement Agreement and, accordingly, waived contributions for the period from June 1985 through December 1985 for those employees enrolled in the Union pursuant to the Settlement Agreement
 
 
 [9]
 The Funds are essentially third-party beneficiaries to the CBAs between Sobie and the Union. Central States, Southeast & Southwest Areas Pension Fund v. Kraftco, 799 F.2d 1098, 1107 (6th Cir.1986), cert. denied, 479 U.S. 1086 (1987)
 
 
 [10]
 The testimony revealed that the Union and Sobie understood the term apprentice as referring to a carpenter enrolled in an organized apprenticeship program described in the CBA. The CBA provision on apprenticeship provides, in pertinent part:
 It is considered to be the joint obligation of both the contractors and the Union to provide and train an adequate number of apprentices. Each employer employing four (4) or more journeymen carpenters shall be obligated to employ and train under the Apprenticeship Committee one (1) apprentice when available and one (1) additional apprentice for every additional eight (8) journeymen employed. Uniform apprenticeship standards that have been adopted by both parties shall remain in full force and effect and any future changes made by the parties apprenticeship committees shall be considered a part of this agreement. The placement or replacement of apprentices shall be governed by the Carpenters Joint Apprenticeship Committee.
 CBA Article XIV (App. 42).
 
 
 [11]
 The Funds did file an untimely motion for reconsideration of the fee award, which was denied. The May 11, 1988, order awarding attorney's fees was an appealable order. Myers v. Ace Hardware, Inc., 777 F.2d 1099 (6th Cir.1985). On June 2, 1988, the Funds filed their motion for reconsideration. Construing the motion for reconsideration as a motion to alter or amend a judgment or, alternatively, for a new trial, under Fed.R.Civ.P. 59(b) or 59(e), we note that the motion for reconsideration was not filed within the requisite ten days after entry of the judgment. See Kennedy v. Cleveland, 797 F.2d 297 (6th Cir.1986), cert. denied sub nom. Hanton v. Kennedy, 479 U.S. 1103 (1987)
 
 
 [12]
 Section 1145 provides:
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
 
 
 [13]
 The district court determined that the June 1985 Settlement Agreement between Sobie and the Union barred the Funds' claims based on principles of apparent authority, equitable estoppel, and/or accord and satisfaction
 
 
 [14]
 Although we decline to reach the statute of limitations issue, we note that in Laborers' Pension Trust Fund v. Sydney Weinberger Homes, Inc., 872 F.2d 702 (6th Cir.1988), we found the six-year statute of limitations governing contract actions appropriate in Tennessee. See also Kraftco, 799 F.2d 1098